**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

Berwin Lashon Grady,

                                Plaintiff,         Civ. No. 11-686 (RHK/JSM)

v.                                          **MEMORANDUM OPINION
                                                     AND ORDER**

Officer Michael Becker, *et al.*,

                                Defendants.

Zorislav R. Leyderman, Law Office of Zorislav R. Leyderman, Minneapolis, Minnesota, for Plaintiff.

Darla J. Boggs, Burt T. Osborne, C. Lynne Fundingsland, Minneapolis City Attorney's Office, Minneapolis, Minnesota, for Defendants.

**INTRODUCTION**

This case arises out of Plaintiff Bervin Lashon Grady's arrest on October 26, 2010. After Grady fled from the police, officers used a canine to chase him down and apprehend him, resulting in bite wounds to his right arm. Grady has sued four officers involved in the incident – Defendants Michael Becker, Scott Creighton, Todd Babekuhl, and Charles McCree – and the City of Minneapolis (the "City"), asserting that the officers (and hence the City) violated his constitutional rights and Minnesota law. Presently before the Court is Defendants' Motion for Summary Judgment. For the reasons that follow, the Court will grant the Motion in part and deny it in part.

## BACKGROUND

Most of the events culminating in Grady's arrest are undisputed. On October 26, 2010, around 2:30 p.m., Grady was driving his car in north Minneapolis. Officers Babekuhl and Creighton were patrolling the area in a marked squad car; Babekuhl was driving and Creighton was in the passenger seat. After they observed Grady make a right turn without signaling, Babekuhl activated the squad car's overhead lights to pull Grady over. Grady drove his vehicle to a gas station and stopped, and the officers pulled in behind him, exited their vehicle, and walked up to his car.

Grady sped off as the officers approached.[1] Babekuhl and Creighton raced back to their car and took off after him; they also radioed that they were chasing a fleeing suspect and needed backup. The ensuing chase spanned several miles along city streets, with Grady speeding and running stop signs along the way. Eventually, he turned his car into an alley between Emerson Avenue North and Dupont Avenue North. There, the car inexplicably stopped functioning, rolling to a stop in the alleyway.

Babekuhl and Creighton arrived moments later, pulling their squad car alongside Grady's vehicle, hoping to prevent him from opening the door. Grady, however, managed to squeeze between the two vehicles and ran northbound down the alleyway. Babekuhl gave chase on foot, while Creighton remained in the squad car, prevented from opening the passenger door due to its proximity to Grady's car. Becker, who had driven to the area after hearing about the chase on his police radio, arrived at approximately the

---

[1] Grady claims he fled because he recognized the officers from a previous encounter in which they had threatened him. Ultimately, the reason he fled is irrelevant.

same time as Grady and Babekuhl, and he pulled up behind Grady's car. He, too, began chasing Grady down the alley on foot.

Meanwhile, McCree had heard about the chase over his police radio and drove to the area with his canine partner "Midnite." Midnite is a German Shepherd trained in the "bite and hold" method of apprehension, meaning the dog will locate a suspect, bite him, and hold him until released by McCree. McCree and Midnite arrived on scene at about the time Grady exited from his car. McCree observed Grady run down the alley, with Babekuhl and Becker in pursuit 30 or 40 feet behind. At that point, McCree retrieved Midnite from the back seat of his car and released the dog to apprehend Grady.

The parties dispute whether McCree shouted any warnings before releasing the dog. Grady, Babekuhl, and Becker each testified in his deposition that he heard no warnings. On the other hand, McCree testified that he yelled two or three times, "Police canine, stop running or I'm gonna release the dog."[2]

Midnite raced up the alley as Grady took a hard right turn around a garage, where he encountered a tall fence. He contends that he quickly realized he would be unable to climb the fence and decided to voluntarily surrender, turning around and getting down on the ground on his hands and knees. Babekuhl and Becker rounded the garage seconds later and grabbed Grady's left arm to handcuff him. Midnite then rounded the garage and

---

[2] McCree's squad car was equipped with a dashboard camera, which recorded audio of the events. (No useful video was captured because McCree's car was facing down 29th Avenue, perpendicular to the alleyway in question.) All agree that McCree can be heard on the recording yelling at Midnite "Heel! Heel! Heel!" shortly after removing the dog from the car. The recording then becomes inaudible; what seems to be yelling is recorded, but it is unclear what was being said or who was saying it.

ran directly at Grady. He yelled out, "Get the dog, get the dog," and instinctively moved his right hand to protect his face. Midnite then bit him on the right forearm and began tugging. Approximately 10 to 15 seconds later, McCree ran around the corner of the garage and removed the dog. The officers handcuffed Grady, but he alleges that either Babekuhl or Becker then kneeled on his face for 30 to 40 seconds before the officers finally lifted him up and placed him into one of the squad cars.[3] Grady was transported to the hospital and treated for the dog-bite wounds, which later became infected and eventually scarred.

Grady commenced the instant action on March 21, 2011, asserting seven claims: excessive force against Babekuhl, Creighton, Becker, and McCree under the Fourth and Fourteenth Amendments to the United States Constitution (Count I);[4] a Monell claim[5] against the City of Minneapolis due to the alleged excessive force (Count II); assault (Count III) and battery (Count IV) against all Defendants; intentional (Count V) and negligent (Count VI) infliction of emotional distress against all Defendants; and

---

[3] The Court accepts these "facts" for purposes of the instant Motion but notes that the officers tell a different story. They assert that Midnite ran past Babekuhl and Becker at about the time the officers turned at the garage, and they observed the dog bite Grady on his right arm as he was attempting to climb the fence. Babekuhl grabbed Grady and brought him to the ground to handcuff him, and McCree appeared shortly thereafter and removed the dog. Grady was then handcuffed and placed into one of the squad cars.

[4] While Count I alleges that the officers violated the Fourth *and* Fourteenth Amendments, this is but two different ways of stating the same claim, as the Fourth Amendment is made applicable to state actors through the Fourteenth Amendment. See, e.g., Mapp v. Ohio, 367 U.S. 643, 655 (1961). Hence, excessive-force claims by arrestees "should be analyzed under the Fourth Amendment," Graham v. Connor, 490 U.S. 386, 395 (1989), and Grady does not contend otherwise in his brief.

[5] Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658 (1978).

negligence against all Defendants (Count VII).  With discovery complete, Defendants now move for summary judgment on all of Grady's claims.  At oral argument, Grady conceded dismissal of all claims against Creighton; the Monell claim; the claims for intentional and negligent infliction of emotional distress; and the negligence claim.  What remain for resolution, therefore, are the following claims:  excessive force (Count I) against Babekuhl, Becker, and McCree; and assault (Count III) and battery (Count IV) against these officers and the City.  The Court held a hearing on October 25, 2012, and the Motion is now ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

## ANALYSIS

**I.   Excessive force (Count I)**

Grady's excessive-force claim comprises two distinct allegations: that (1) McCree used excessive force by releasing Midnite without first giving a warning and (2) Babekuhl or Becker (he is unsure who) used excessive force by kneeling on his face. The officers assert that they are entitled to qualified immunity on these claims. The Court agrees only in part.

**A.   Qualified immunity principles**

Qualified immunity insulates government officials from suit when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (citation omitted). Officers "are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Luckert v. Dodge Cnty., 684 F.3d 808, 817 (8th Cir. 2012) (citation omitted). Hence, "all but the plainly incompetent or those who knowingly violate the law" are protected. Id.

In analyzing whether a police officer is entitled to qualified immunity, the Court must answer two questions: Do the facts show that the challenged conduct violated a constitutional right? And if a violation could be established on those facts, was the right clearly established on the date in question? E.g., Avalos v. City of Glenwood, 382 F.3d 792, 798 (8th Cir. 2004) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). The Court is "permitted to exercise [its] sound discretion in deciding which of the[se] two [questions]

should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236.

The constitutional right at issue here is the Fourth Amendment's prohibition on excessive force. Whether a police officer used constitutionally excessive force is analyzed under an "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 392 (1989); Samuelson v. City of New Ulm, 455 F.3d 871, 875 (8th Cir. 2006). The Court must evaluate the facts and circumstances surrounding the use of force, "including the severity of the crime at issue, whether the [plaintiff] pose[d] an immediate threat to the safety of the officers or others, and whether [the plaintiff] . . . resist[ed] arrest or attempt[ed] to evade arrest by flight." Samuelson, 455 F.3d at 875 (internal quotation marks and citation omitted). Put another way, determining the reasonableness of the force requires the Court to "evaluate the totality of the circumstances," "careful[ly] balancing of the nature and quality of the intrusion on [Grady's] Fourth Amendment interests against the countervailing governmental interests at stake." Copeland v. Locke, 613 F.3d 875, 881 (8th Cir. 2010) (citations omitted). This inquiry is an objective one, "without regard to [each officer's] underlying intent or motivation." Samuelson, 455 F.3d at 875-76 (citation omitted). The "use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and the Court must remain mindful that "officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force . . . necessary." Graham, 490 U.S. at 396-97 (citation omitted).

### B. McCree's release of Midnite

Grady asserts that McCree's release of Midnite without an advance warning violated his Fourth Amendment rights. "[R]eview of excessive force claims involving police dogs is properly governed by the general [reasonableness] standard established in Graham." Kuha v. City of Minneapolis, 365 F.3d 590, 598 (8th Cir. 2003), abrogated on other grounds by Szabla v. City of Brooklyn Park, 486 F.3d 385 (8th Cir. 2007) (*en banc*). Applying that standard here, the Court cannot conclude McCree is entitled to qualified immunity.

As noted above, the reasonableness of a police officer's conduct turns on the totality of the circumstances, and hence there exists no *per se* rule that deployment of a police canine is unreasonable unless preceded by a warning. Kuha, 365 F.3d at 599 ("[T]here may be exceptional cases where [a canine] warning is not feasible."). That said, the *general* rule is that absent a threat to his safety, a police officer must warn a suspect before releasing a dog upon him. As our Court of Appeals recognized in Kuha, "the presence or absence of a warning is a critical fact in virtually every excessive force case involving a police dog." Id.

In Kuha, the plaintiff fled after his car was pulled over by a police officer for a "routine traffic stop" in the middle of the night. Id. at 595. The officer attempted to follow the plaintiff but he disappeared into a swamp abutting the roadway. Other officers arrived to assist, and with a police canine leading the way, the officers proceeded into the swamp to try to locate the plaintiff. The dog found him first and bit his upper leg, severing his femoral artery. It was undisputed that the officers had not given any warning

before using the dog in the search. The district court granted summary judgment to the officers based on qualified immunity, but the Eighth Circuit reversed, concluding that "a jury could properly find it objectively unreasonable to use a police dog trained in the bite and hold method without first giving the suspect a warning and opportunity for peaceful surrender." Id. at 599.

Notably, the Court of Appeals rejected the district court's determination that requiring a warning could have threatened the officers' safety "by giving away their location to a hiding suspect whom they did not know for certain was unarmed." Id. Indeed, it noted that a verbal warning "would likely *diminish* the risk of confrontation by increasing the likelihood that a suspect will surrender." Id. (emphasis added). The court also found that the officers could "have placed themselves out of harm's way . . . and given a loud verbal warning that a police dog was present and trained to seize by force." Id. As a result, it concluded that a jury question existed on excessive force.

The Court perceives no reason to reach a contrary conclusion here. As in Kuha, Grady fled from officers who had stopped him for a routine traffic violation. As in Kuha, the record contains no evidence that Grady was armed or that the officers believed him to be. As in Kuha, the officers could have "placed themselves out of harm's way" by remaining in their vehicles or taking cover behind any of the nearby structures and announcing the presence of a police canine. Hence, for the reasons stated in Kuha, a reasonable jury could conclude that McCree was required to give a warning before deploying the dog.

McCree does not appear to argue otherwise.  While he claims that Grady posed a danger to the officers (and others), he stops short of arguing that he was not required to warn Grady before deploying the dog.  Indeed, he acknowledged in his deposition that under the Minneapolis Police Department canine unit's Standard Operating Procedures, he was obligated to give a warning under the circumstances here.

Nevertheless, McCree argues that he is entitled to qualified immunity because he *did* provide warnings to Grady, "two or three times," before releasing Midnite.  (Def. Mem. at 16.)  According to his brief, the squad car video "presents such strong evidence that [he] shouted canine warnings that no reasonable jury could disagree as to whether the warnings were given."  (Id. at 16-17.)  Yet barely half a page later, it acknowledges that McCree was "shouting so loudly that the . . . microphone apparently topped out" and, as a result, his "*exact words are not clearly distinguishable*" on the recording.  (Id. at 17 (emphasis added).)  That is consistent with the Court's own review of the recording – it simply cannot be determined with any certainty what is being said or by whom. Particularly when viewing the evidence in the light most favorable to Grady, this belies McCree's contention that the recording "unequivocally confirms that [he], with Midnite at his side, yelled [warnings] down the alley at the top of his lungs."  (Id. at 19.)[6]

Other evidence in the record also undermines McCree's assertion.  First, Grady asserts that he heard no warning from McCree.  Second, and more importantly, Babekuhl

---

[6] It is for this reason that McCree's reliance upon Scott v. Harris, 550 U.S. 372 (2007), and other similar cases, including the undersigned's decision in Bishop v. Glazier, __ F. Supp. 2d __, 2012 WL 2244255 (D. Minn. June 15, 2012), is misplaced. Scott held that a court need not accept the plaintiff's version of events in a qualified-immunity case when it is "blatantly contradicted by the record." 550 U.S. at 380. For the reasons just stated, that is not the case here.

- 10 -

and Becker also testified they heard no warning, and it is undisputed they were 30 to 40 feet closer to McCree at the time the alleged warnings were given. McCree dismisses these facts, asserting that the failure to *hear* a warning is different from not *giving* one. (Id. at 19 ("That McCree's warning[s] did not register with them is unsurprising, as all three were under great stress in the heat of the chase.").)  This may be true, but it also misses the point.  A reasonable jury could *infer* that no warning was given from the fact Grady, Babekuhl, and Becker did not hear one.  Indeed, accepting McCree's logic would render it nearly impossible for a plaintiff to show that no warning was given in the face of a contrary assertion by an officer.  In essence, McCree wants Grady to "prove a negative" by showing that no warning was given.  What better proof could he offer than the fact he (and the other officers) did not hear one?  See Am. Boat Co. v. Unknown Sunken Barge, 418 F.3d 910, 914 (8th Cir. 2005) ("In cases involving lack of notice, there is often little a party can do except swear he or she did not receive the communication.").[7]

McCree relies upon Musolf v. Ellis, Civ. No. 07-4764, 2009 WL 2171005, at *3 (D. Minn. July 17, 2009) (Tunheim, J.), for the proposition that "[e]ven if there was no evidence that a canine warning was given, that alone would be insufficient to entitle [a plaintiff] to summary judgment on his excessive force claim." (Def. Mem. at 20.)  But this merely states the unremarkable; as noted above, Kuha held that the absence of a warning does not violate the Fourth Amendment *per se*, but rather is a "critical fact" in the excessive-force analysis.  Moreover, Musolf's procedural posture reveals why it does

---

[7] McCree asserts that Grady told him, at the hospital after the arrest, that he (Grady) was aware he was being chased by a dog.  But Grady disputes making any such statement, and hence the Court disregards it for present purposes.

not aid McCree's cause. That case denied summary judgment *to the plaintiff*, because "the question of whether the warning was given is disputed." 2009 WL 2171005, at *3. Here, as there, it is disputed whether McCree gave a warning. This prevents the Court from resolving the excessive-force claim as a matter of law. See also Kruse v. Jackson, Civ. No. 05-2123, 2006 WL 3758204, at *5 (D. Minn. Dec. 20, 2006) (Rosenbaum, J.) ("If there was no warning, . . . there is a constitutional question. And there is a clear factual issue on this point: plaintiff and his witness deny hearing a warning; Officer Jackson claims he gave one. Therefore, plaintiff has shown a genuine issue of fact as to whether Officer Jackson gave the warning required by the Eighth Circuit in Kuha.").

McCree also notes that "[t]he purpose of a canine warning is to allow the suspect an opportunity to surrender." (Def. Mem. at 21.) But he stretches this principle too far by arguing that the "effect of a canine warning is . . . immaterial to this case" because, by Grady's own reckoning, he voluntarily surrendered before he knew Midnite was chasing him. (Id.) Kuha instructs that the relevant question is whether a warning was given *before the dog was deployed*. Grady testified in his deposition that had he been warned about a dog, he would have immediately given himself up. In other words, under that scenario, Midnite would not have been released and Grady would not have been bitten. Because (under his version of the facts) Grady was never afforded that opportunity, even though he later voluntarily surrendered, he has created a jury question on his excessive-force claim.[8]

---

[8] Besides puncture wounds and scars on his arm, Grady also alleges that he suffered depression, anxiety, and similar mental distress as a result of McCree's conduct. The record indicates that

- 12 -

### C. Kneeling on Grady's face

Grady next asserts that Babekuhl or Becker – he is unsure who – used excessive force by kneeling on his face after he was handcuffed, causing him "abrasions" and "significant pain and discomfort[] for approximately 30-40 seconds." (Mem. in Opp'n at 33, 37.) The Court agrees with the officers that they are entitled to qualified immunity on this claim.

The Eighth Circuit recognized in 2011 that "over the course of more than fifteen years," it had "remain[ed] an open question in this circuit whether an excessive force claim requires some minimum level of injury." Chambers v. Pennycook, 641 F.3d 898, 904 (8th Cir. 2011). Different Eighth Circuit panels had reached different answers to that question since the 1990s. Compare, e.g., Lambert v. City of Dumas, 187 F.3d 931, 936 (8th Cir. 1999) (Kyle, J., sitting by designation) (concluding that a plaintiff may state an excessive-force claim as long as he suffered *some* injury, no matter how minor), with Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir. 2005) (noting that a "*de minimis* . . . injury is insufficient to support a finding of a constitutional violation"). Chambers put an end to this uncertainty, holding that the inquiry must focus on the force applied and *not* its end result, that is, the level of injury:

> A *de minimis* use of force is insufficient to support a claim, and it may well be that most plaintiffs showing only *de minimis* injury can show only a corresponding *de minimis* use of force. The degree of injury is certainly relevant insofar as it tends to show the amount and type of force used. But

---

Grady has a lengthy history of psychological issues, dating from well before the incident giving rise to this case. If he intends to offer evidence of emotional distress at trial, he will be required to first show that the distress can be tied to the events in question here, and even if he can do so, inquiry into his prior psychological issues is likely to be permitted on cross-examination.

> it is logically possible to prove an excessive use of *force* that caused only a minor *injury*, and a rule that forecloses a constitutional claim in that circumstance focuses on the wrong question.
>
> The degree of injury should not be dispositive, because the nature of the force applied cannot be correlated perfectly with the type of injury inflicted. Some plaintiffs will be thicker-skinned than others, and the same application of force will have different effects on different people. A greater than *de minimis* injury requirement under the Fourth Amendment would mean that the same quantum of force, in the same circumstances, could be unconstitutional when applied to a citizen with a latent weakness and constitutional when applied to a hardier person. The governing rule should not turn on such unpredictable and fortuitous consequences of an officer's use of force. The rule should focus instead on whether *the force applied* is reasonable from the perspective of a reasonable officer on the scene at the time the force is used.

641 F.3d at 906 (citations omitted).

But as Chambers recognized, the Eighth Circuit's inconsistent decisions had left it unclear whether "an officer violated the rights of an arrestee by applying force that caused only *de minimis* injury." Id. at 908. "Given the state of the law" before Chambers, a reasonable police officer "could have believed that as long as he did not cause more than *de minimis* injury to an arrestee, his actions would not run afoul of the Fourth Amendment." Id. In other words, it was not clearly established pre-Chambers that an officer violated an arrestee's rights, no matter how much force he applied, if he caused only *de minimis* injuries. Id. at 908-09. As a result, the Eighth Circuit determined that the police officers in Chambers, who were accused of excessive force but who caused only *de minimis* injuries, were entitled to qualified immunity because at the time of the plaintiff's arrest (August 2005) it was "reasonable for the officers to believe that they remained within constitutional bounds if that was the result" of their conduct. Id.

Chambers scuttles Grady's excessive-force claim vis-a-vis an officer kneeling on his face. The conduct he challenges occurred in October 2010, before the Eighth Circuit clarified the law on *de minimis* injury. And under Chambers (and cases preceding it), injuries such as those identified by Grady here, which were fleeting and caused him no permanent harm, are *de minimis* as a matter of law. Id. at 906 ("'[R]elatively minor scrapes and bruises' and a 'less-than-permanent aggravation of a prior shoulder condition' are to be considered *de minimis* injuries.") (quoting Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006)); Andrews, 417 F.3d at 818 (sore neck and "horrible, horrible headache" were *de minimis* injuries); Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1082 (8th Cir. 1990) ("[A]llegations of pain as a result of being handcuffed, without some evidence of more permanent injury, are [not] sufficient to support [a] claim of excessive force."). Because "[i]t was not clearly established [in October 2010] that an officer violated the rights of an arrestee by applying force that caused only *de minimis* injury," Chambers, 641 F.3d at 908, Babekuhl and Becker and entitled to immunity.[9]

Grady relies upon Hemphill v. Hale, 677 F.3d 799 (8th Cir. 2012) (*per curiam*), for the proposition that "where no use of force is permissible under the circumstances, the plaintiff is not required to show more than a *de minimis* injury." (Mem. in Opp'n at 36.) And he asserts that no use of force was appropriate here because he was already in

---

[9] Grady correctly notes that certain pre-Chambers decisions held that injuries similar to those here were sufficient to support an excessive-force claim. See, e.g., Lambert, 187 F.3d at 936 (small cut to eyelid and scrapes on legs); Dawkins v. Graham, 50 F.3d 532, 535 (8th Cir. 1995) (facial cuts and bruises). These cases simply highlight that the law in the Eighth Circuit was not clearly established prior to Chambers. Cf. Wertish, 433 F.3d at 1065-67 (bruised ribs, sore shoulder, and "multiple abrasions to [the] face and head" *de minimis* as a matter of law).

- 15 -

custody and not resisting when one of the officers kneeled on his face.[10] But Hemphill is distinguishable, because that case concerned the use of force "in an attempt to coerce consent to a search"; indeed, the Eighth Circuit expressly noted that "Chambers . . . did not address the situation alleged here." 677 F.3d at 801. And in deciding Hemphill, the court reiterated that "the state of the law [pre-Chambers] was such that a reasonable officer could have believed that as long as he did not cause more than *de minimis* injury to an arrestee, he would not violate the Fourth Amendment." Id. At bottom, Hemphill simply does not aid Grady's cause.

For all of these reasons, the Court concludes that Babekuhl and Becker are entitled to qualified immunity on Grady's excessive-force claim.

## II. The state-law claims

Grady also asserts claims against Babekuhl, Becker, McCree, and the City for assault and battery under Minnesota law.[11] The officers argue they are entitled to official immunity on these claims. The City does not expressly argue that it, too, is entitled to immunity, although it seems implicit from its Motion papers that it seeks the benefit of

---

[10] At oral argument, Grady pointed to Chambers for this proposition, but that case actually undermines his argument. Chambers was not resisting, in custody and in the process of being transported to a local hospital, when the allegedly excessive force was applied by the officers. Nevertheless, the Eighth Circuit concluded that the officers were entitled to qualified immunity on *de minimis* injury grounds. See 641 F.3d at 908-09.

[11] The parties have not attempted to distinguish the assault and battery claims. But assault requires proof of "threaten[ed] bodily harm to another with the present ability to effectuate that threat," Hixon v. City of Golden Valley, Civ. No. 06-1548, 2007 WL 1655831, at *10 (D. Minn. June 7, 2007) (Kyle, J.) (citing Elwood v. Cnty. of Rice, 423 N.W.2d 671, 679 (Minn. 1988)), while battery focuses on whether there was "an intentional and unpermitted contact by defendant on the person of the plaintiff," Johnson v. Peterson, 358 N.W.2d 484, 485 (Minn. Ct. App. 1984). In the Court's view, the facts here more easily fit battery than assault. Nevertheless, the Court follows the parties' lead and analyzes these claims together.

that defense. And if the officers are entitled to immunity, the City likely is as well under the doctrine of vicarious official immunity. See, e.g., Hayek v. City of St. Paul, 488 F.3d 1049, 1057 (8th Cir. 2007); Wiederholt v. City of Minneapolis, 581 N.W.2d 312, 316 (Minn. 1998) ("[I]t would be anomalous . . . to impose liability on the [municipality] for the very same acts for which [the officer] receives immunity.").

Official immunity shields a public official from liability if he is "charged by law with duties which call for the exercise of his judgment or discretion" and, in performing those duties, he has not committed "a willful or malicious wrong." Garcia v. Hennepin Healthcare Sys., Inc., Civ. No. 11-1639, 2011 WL 4808200, at *1 (D. Minn. Oct. 11, 2011) (Kyle, J.) (quoting Anderson v. Anoka Hennepin Indep. Sch. Dist. 11, 678 N.W.2d 651, 655 (Minn. 2004)).[12] "In the context of official immunity, 'willful' and 'malicious' are synonymous," as malice means "'nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right.'" Brown v. City of Golden Valley, 574 F.3d 491, 500-01 (8th Cir. 2009) (quoting Rico v. State, 472 N.W.2d 100, 107 (Minn. 1991)). Here, McCree testified that he believed, under the City's canine policy, that he was required to give a warning before releasing the dog. If a jury were to conclude that no warning was in fact given, it could equally conclude that McCree had "intentionally committed an act that he

---

[12] Public officials generally are *not* entitled to official immunity in connection with ministerial acts, that is, acts that "involv[e] mere[] execution of a specific duty arising from fixed and designated facts." Wiederholt, 581 N.W.2d at 315-16 (citation omitted). Grady argues that the release of Midnite without a warning was ministerial because McCree knew he was required to give a warning, based on the police department's Standard Operating Procedures for the canine unit. (Mem. in Opp'n at 39.) But McCree is not entitled to qualified immunity even assuming *arguendo* that his release of Midnite was discretionary and not ministerial.

. . . had reason to believe [was] prohibited" by City policy.  Baribeau v. City of Minneapolis, 596 F.3d 465, 482 (8th Cir. 2010).  Hence, he is not entitled to immunity on the assault and battery claims, and as a result, neither is the City.

However, the Court reaches the opposite conclusion with respect to Babekuhl and Becker.  As noted above, it was not clearly established on the date in question that causing *de minimis* injury violated an arrestee's rights.  Hence, these officers are entitled to official immunity on Grady's state-law claims, because he cannot show they violated a *known right* when (allegedly) kneeling on his face.  See, e.g., Jones v. Clark, Civ. No. 10-510, 2012 WL 388699, at *17 (D. Minn. Feb. 7, 2012) (Nelson, J.); McClennon v. Kipke, 821 F. Supp. 2d 1101, 1111 (D. Minn. 2011) (Kyle, J.).[13]

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 23) is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **DENIED** with respect to Grady's (1) excessive-force claim against McCree and (2) assault and battery claims against McCree and the City.  In all other respects, the Motion is **GRANTED**, and the remaining claims in the Complaint are **DISMISSED WITH PREJUDICE**.

Date:  November 13, 2012        s/Richard H. Kyle
                                RICHARD H. KYLE
                                United States District Judge

---

[13] Defendants also argue that Grady's assault and battery claims fail because he "fails to state an actionable claim for excessive force."  (Def. Mem. at 37.)  This argument falters because the Court has concluded that the excessive-force claim survives, at least in part.